UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DAVID L. JACOBSON,

                                Plaintiff,

                -against-

ANDREW SAUL, Commissioner of the
Social Security Administration,

                                Defendant.

-----------------------------------------------------------------X

**19-CV-3113 (SN)**

**OPINION & ORDER**

**SARAH NETBURN, United States Magistrate Judge.**

       Plaintiff David L. Jacobson ("Plaintiff" or "Jacobson") seeks judicial review of a final decision by the Social Security Administration ("SSA") finding that he is not entitled to Disability Insurance Benefits ("DIB"), Supplemental Security Income ("SSI"), and Child Insurance Benefits ("CIB"). 42 U.S.C. §§ 405(g), 1383(c)(3). The parties cross-moved for judgment on the pleadings. ECF Nos. 13 & 18. The parties consented to my jurisdiction.

       The Court finds that the decision of the Appeals Council—which adopted in significant part the decision of the Administrative Law Judge ("ALJ")—was based on legal error. Accordingly, Plaintiff's motion for judgment on the pleadings is GRANTED, and the Commissioner's cross-motion is DENIED.

# BACKGROUND

## I. Procedural History

Jacobson filed an application for DIB on November 12, 2015; SSI on January 31, 2015; and CIB on January 14, 2016.[1] ECF No. 12, SSA Administrative Record[2] ("Tr."), at 28, 171, 175, 189–91. The agency denied his claims for DIB, SSI, and CIB on June 1, 2015, and Jacobson requested a hearing before an ALJ. Tr. 68–72. Jacobson appeared for an initial hearing before ALJ Michael J. Stacchini on June 16, 2016, which was adjourned for additional fact-gathering. Tr. 45–54. Jacobson and his mother, Amy Lieberman, appeared at the final hearing before ALJ Stacchini on November 1, 2016. Tr. 448–69. Both Jacobson and his mother testified at the hearing, as did a vocational expert. Id. On December 14, 2016, the ALJ denied Jacobson's claims for DIB and SSI; the decision failed to address Jacobson's application for CIB. Tr. 25–44. Jacobson sought review by the Appeals Council, which granted his request on February 8, 2018. Tr. 166–70. On August 30, 2018, the Appeals Council upheld the ALJ's findings as to Jacobson's SSI and DIB applications and made an additional determination as to Jacobson's CIB application, finding that he was ineligible for CIB and not disabled since September 30, 2013—the earlier disability onset date for his CIB application. Tr. 16–23. Thus, the Appeals Council's decision is the final decision of the Commissioner. See Sims v. Apfel, 530 U.S. 103, 106–07

---

[1] There appears to be some discrepancy as to the dates of Jacobson's SSI, DIB, and CIB applications. The ALJ described Jacobson as having filed a DIB application on November 12, 2015, and an SSI application on January 31, 2015. Tr. 28. The Appeals Council noted that Jacobson's applications were filed on January 20, 2015, January 30, 2015, and November 12, 2015. Tr. 23. Included in the record, however, is a Disability Determination and Transmittal form that indicates Jacobson's DIB claim was filed on January 31, 2015, Tr. 67, and DIB and SSI application summaries that indicate filing dates of February 24, 2015. Tr. 171, 175. The application summary for Jacobson's CIB claim indicates a filing date of January 14, 2016. Tr. 189.

[2] The SSA Administrative Record continues through ECF No. 12, Exs. 1 & 2.

(2000) ("[I]f the Appeals Council grants review of a claim, then the decision that the Council issues is the Commissioner's final decision.").

## II.     Jacobson's Background

David Jacobson was born on August 28, 1992, and was 24 years old when the ALJ issued his decision. Tr. 67. As a child, Jacobson underwent surgery for the removal of a brain tumor and was treated for "treatment resistant epilepsy." Tr. 394. He also later underwent surgery to repair pectus excavates, a deformity of the breastbone. Tr. 334–38.

Jacobson attended special education classes beginning in 2007. Tr. 218. He received an Individualized Education Plan (IEP) and an IEP diploma was expected in 2013, although in 2012, Jacobson refused services. Tr. 227. Throughout his childhood and adolescence, Jacobson was treated for epilepsy and brain tumors. Tr. 394.

At the time of the ALJ hearing, Jacobson was living alone in an apartment. Tr. 459–60. He testified that he could cook for himself, clean, grocery shop, and do his laundry. Tr. 460–61, 463. Jacobson also testified that he could drive and had a driver's license but did not have a car. Tr. 467. He also testified that he could take public transit and bike around town. Tr. 462. At the time of the ALJ hearing, he was working at a grocery store, where he was working four hours a week. Tr. 466, 471. He had previously worked six hours, four days a week at the grocery store, but his hours had been reduced due to a conflict with a supervisor. Tr. 466. He had previously worked at another grocery store. Tr. 474.

## III.     Medical Evidence

The parties generally agree on the medical evidence in the Administrative Record. See ECF No. 14 at 3–14; ECF No. 19 at 2–11. However, given Plaintiff's claim that his treating

3

physicians should have been afforded more weight, the relevant medical opinions are summarized below.

### A.  Dr. Candida Fink

Dr. Candida Fink had been Jacobson's treating psychiatrist since June 2009. Tr. 369. Her report following a March 11, 2015 exam of Jacobson noted that he suffered from intellectual disability; chronic encephalopathy; disruptive mood dysregulation disorder; ADHD, severe, combined preservation; seizure risk with history of seizures; brain tumor and surgeries and status post-cerebrovascular accident. Id. She also noted that he had the following symptoms: impaired comprehension and insight regarding life skills, cause/effect, tasks/steps required to achieve goals; limited ability to abstract, understand social cues or other's responses, or the effects of his behavior on others; impaired focus, concentration, activation to risk; impaired ability to follow directions, work with others, delay gratification, wait, turn-take, and listening. Id. Regarding activities of daily living, Dr. Fink found that Jacobson was not independent and was immature; had immature communication skills; could not manage money; had chronic irritability with occasional outbursts; fabricated stories; and had low energy. Id. She indicated his medications included Lamotrigine, Adderall, and Depakote. Tr. 370. She concluded that Jacobson's conditions were chronic, life-long, and with a poor prognosis. Id.

Dr. Fink noted that school testing done in 2009 showed Jacobson had a full scale IQ of 75, verbal comprehension score of 76, perceptual reasoning score of 90, working memory score of 74, and a processing speed score of 76. Id. She opined that while Jacobson's test scores were borderline, his "adaptive function is far below average, in the low functioning range." Id. She also opined that Jacobson had a limited ability to function in a work setting—while he could perform some basic work tasks, she determined his "actual capacity to function in a job" was

"quite limited." Tr. 373. She concluded that Jacobson's sustained concentration and persistence would be limited, given his "impaired capacity to work with others, work independently, follow a routine or schedule," noting he was "highly distractible," with "low frustration tolerance" and "low energy." Tr. 374. She also opined that his social interaction and adaptation was limited given his "poor awareness of others' responses, needs," "poor social pragmatics," and inability to "plan/set realistic goals." Id. She opined that Jacobson had "very impaired insight into his skills versus his goals," and that he had "no tolerance for work tasks more consistent with his abilities." Id.

Dr. Fink's subsequent records indicate some improvement, such as Jacobson's ability to ride a bike around town, live on his own, and "perform concrete, well-practiced, simple behaviors in a very limited range of work settings." Tr. 395–401. Nevertheless, Dr. Fink maintained that Jacobson was limited in his ability to function as an independent adult because of his mental deficits. Tr. 395–96.

### B. Dr. Orrin Devinsky

Dr. Orrin Devinsky was Jacobson's treating neurologist for more than 18 years. Tr. 394. Dr. Davinksy described Jacobson's "treatment resistant epilepsy" as a child as well his surgery for the removal of a "left temporal low grade tumor." Id.; see also Tr. 363–64. Due to a stoke, complications from the surgery resulted in persistent neurological deficits. Tr. 394. According to Dr. Devinsky, Jacobson's impairments include: "'theory of mind,' the ability to understand how another person is thinking and reacting" to his words and actions, severe attention deficit

5

disorder, "problems with executive functions that impair judgment reasoning, and planning," language, and maturity. Tr. 394.

### C. Dr. Carol McLean Long

Dr. McLean Long examined Jacobson on April 9, 2015, for an internal medicine examination. Tr. 381–85. Dr. McLean Long noted that Jacobson answered questions himself, without his mother's assistance. Tr. 383. Jacobson expressed that he was living alone at the time of her examination, and that he was able to cook, clean, do laundry, shower, bathe, and dress himself. Id. Jacobson also reported that his mother helped him with shopping because he could not drive. Id. Dr. McLean Long's physical examination of Jacobson was unremarkable, except for some tenderness in his chest following the surgical removal of rods. Tr. 383–84. She also noted Jacobson "dressed appropriately, maintained good eye contact, and appeared oriented in all spheres," and she reported "[n]o evidence of impaired judgment or significant memory impairment." Tr. 385. Dr. McLean Long determined that Jacobson was stable, and had no limitations in his ability to sit, stand, climb, push, pull or carry heavy objects. Id.

### D. Dr. Melissa Antiaris

Dr. Antiaris, a medical consultant, conducted a psychiatric evaluation of Jacobson on April 9, 2015, Tr. 377–80, and an intelligence evaluation on October 11, 2016, Tr. 439–45. During her first evaluation, Dr. Antiaris noted Jacobson was living alone and had finished, but not graduated, high school. Tr. 377. He believed he was not able to work at that time "due to medical concerns." Id. Dr. Antiaris noted Jacobson had previously been hospitalized for three brain surgeries, a spinal surgery, a chin surgery, and a chest surgery. Id. She additionally noted chronic medical conditions of "deviated septum, history of seizures, and history of hemiparesis." Id. At the time, Jacobson expressed difficulty with concentration. Tr. 377–78. Upon a mental

6

status examination, Dr. Antiaris noted Jacobson was "cooperative" and "related adequately." Tr. 378. She found his thought processes "coherent and goal directed with no evidence of hallucinations, delusions, or paranoia," his speech fluent and clear, and his affect full and appropriate. Id. Dr. Antiaris did note that Jacobson's attention and concentration was "mildly impaired due to limited intellectual functioning." Id. Jacobson was able to complete counting and simple calculations but could not complete serial threes. Tr. 378–79. Dr. Antiaris determined that Jacobson's recent and remote memory skills were intact, and his insight and judgment were good. Tr. 379. However, she determined Jacobson's cognitive functioning to be in the below average range, but with an appropriate general fund of information. Id.

Dr. Antiaris determined that there were "no limitations" in Jacobson's ability to follow and understand simple directions and instructions, or to perform simple tasks independently. Id. She found Jacobson to be "mildly limited in his ability to maintain attention and concentration and a regular schedule," and "mildly limited in his ability to learn new tasks and perform complex tasks independently." Id. Dr. Antiaris also determined Jacobson was mildly limited in his ability to make appropriate decisions and relate adequately with others, as well as in his ability to appropriately deal with stress. Id. She concluded that these difficulties were "caused by cognitive deficits." Id. She accordingly noted some "cognitive concerns," but did not believe them to be "significant enough to interfere with" Jacobson's daily functioning. Tr. 380. Dr. Antiaris gave Jacobson a "fair" prognosis and noted his inability to manage his own funds. Id.

Dr. Antiaris evaluated Jacobson again on October 11, 2016. Tr. 439. At that time, Jacobson reported to Dr. Antiaris that he was living alone and working part-time as a bagger in a grocery store four hours per week. Id. Dr. Antiaris observed Jacobson to have appropriate eye contact, adequate speech and language skills, good attention and concentration, with no evidence

of significant emotional distress. Tr. 440. Dr. Antiaris also observed Jacobson as cooperative, friendly, and working with reflection and deliberation. Id.

Dr. Antiaris administered the Wechsler Adult Intelligence Scale, with the following results: Verbal Comprehension Index of 74; Perceptual Reasoning Index of 86; Working Memory Index of 86; Processing Speed Index of 74; and a full scale IQ of 75. Id. This placed Jacobson in the "borderline range" for his full scale IQ, verbal comprehension, and processing speed. Tr. 440–41. His perceptual reasoning and working memory scores placed him in the "low average range." Tr. 441.

Dr. Antiaris again determined that Jacobson had "some difficulty with social skills." Id. She concluded that there were no limitations in his "ability to follow and understand simple directions and instructions," perform simple tasks independently, maintain a regular schedule, make appropriate decisions, relate adequately with others, and appropriately deal with stress. Id. She concluded that Jacobson did have mild limitations in his ability to maintain attention and concentration and perform complex tasks independently, and moderate limitations in his ability to learn new tasks. Id. She again attributed the difficulties to cognitive deficits. Id. Dr. Antiaris listed Jacobson's diagnoses as "borderline intellectual functioning" and "mild neurocognitive disorder," as well as additional diagnoses reported by Jacobson himself. Tr. 441–42. Dr. Antiaris again listed Jacobson's prognosis as fair but determined that he now was able to manage his own funds. Tr. 442.

**E.  P. Kennedy-Walsh, Ph.D.**

P. Kennedy-Walsh, a state agency medical consultant, reviewed Jacobson's records on May 4, 2015, and concluded that Jacobson could understand simple instructions and could interact and adapt to a low-pressure workplace. Tr. 60. Kennedy-Walsh also determined that

Jacobson had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace. Id. Kennedy-Walsh also determined Jacobson had "one or two" repeated episodes of decompensation but did not identify when those had occurred. Id. Kennedy-Walsh deemed Jacobson not to be significantly limited in his ability to carry out short and simple instructions, and moderately limited in his ability to (1) carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (4) sustain an ordinary routine without special supervision, (5) work in coordination with or in proximity to others without being distracted by them, (6) make simple work-related decisions, and (7) complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Tr. 62–63. Kennedy-Walsh also deemed Jacobson moderately limited in most areas of social interaction but found him not significantly limited in his ability to ask simple questions or request assistance. Tr. 63. Kennedy-Walsh determined Jacobson was not significantly limited in most forms of adaptation limitations, but moderately limited in his ability to respond appropriately to changes in the work setting. Tr. 63–64.

### IV.    The ALJ's Determination

The ALJ issued his decision on December 14, 2016, concluding that Jacobson was not disabled. See Tr. 25–40. At step one, the ALJ determined Jacobson met the insured status requirements through December 31, 2013, and had not engaged in substantial gainful activity since January 1, 2014. Tr. 30.

At step two, the ALJ determined that Jacobson had the following severe impairments: "intellectual disability, disruptive mood disorder, attention deficit hyperactivity disorder (ADHD), epilepsy, and ADD." Id. These impairments, he found, imposed a "significant limitation" on Jacobson's "ability to perform work activities" during the relevant period. Id. The ALJ noted Jacobson's congenital pectus excavatum was repaired during surgery in January 2013, with "no residual limitations." Tr. 30–31.

At step three, the ALJ determined that Jacobson's impairments did not equal the severity of any one of the listings in 20 C.F.R. §§ 404.1520(d), 405.1525, 404.1526, 416.920(d), 416.925, and 416.926. Tr. 31. The ALJ referred to Jacobson's "mild restriction" in daily living activities such as dressing, bathing, grooming, cooking, and ability to use public transportation. Tr. 31. The ALJ found Jacobson to have moderate difficulties in social functioning, noting Jacobson's relationship with his siblings and his ability to take public transportation. Id. The ALJ concluded Jacobson has moderate difficulties with concentration and persistence or pace. Tr. 31–32. The ALJ took note that Jacobson's mother helped him manage his finances, that his full scale IQ was 75, and that he displayed "mildly impaired attention and concentration due to limited intellectual functioning with intact recent and remote memory skills." Id. The ALJ noted Jacobson's thought process was "goal directed, organized, linear and logical," despite his treating doctors noting his grandiose thought process. Tr. 32. The ALJ noted no episodes of decompensation. Id.

The ALJ found Jacobson to have the following residual functional capacity ("RFC"):

> a full range of work at all exertional levels but with the following nonexertional limitations: the claimant is able to understand, remember and carry out simple routine tasks in a low stress job defined as having decision making and changed in work setting related to simple routine tasks with occasional interaction with the general public, coworkers and supervisors.

Tr. 33.

At step four, the ALJ determined that Jacobson had no past relevant work. Tr. 38.

At step five, the ALJ concluded that based on Jacobson's RFC, age, education, and work experience and the testimony of Donald Slive, the vocational expert, there are jobs such as laborer and packer that Jacobson could perform, and that these jobs existed in significant numbers in the national economy. Tr. 38–39. Therefore, the ALJ found Jacobson not disabled under the Social Security Act (the "Act"). Tr. 39.

## V.     The Appeal Council's Determination

Jacobson, later represented by counsel, appealed the ALJ's decision, and the Appeals Council granted review on February 8, 2018. Tr. 166; see Tr. 321–29. On August 30, 2018, the Appeals Council issued a decision upholding the ALJ's denial of benefits. Tr. 16–23.[3] The Appeals Council adopted the ALJ's finding that Jacobson was not disabled. Tr. 19. The Appeals Council noted, however, that the ALJ had failed to consider Jacobson's application for CIB, which, as previously noted, alleged disability beginning on September 30, 2013, rather than January 1, 2014, as his SSI and DIB applications alleged. Tr. 19, 189–90, 191–92.

The Appeals Council affirmed the ALJ's findings as to Jacobson's disability from September 30, 2013, through December 14, 2016. Tr. 20. Regarding Jacobson's CIB eligibility, the Appeals Council determined that he must have established his disability before August 28, 2014 (when he turned 22 years old). Id.

With that modified timeline, the Appeals Council then proceeded through the sequential steps. Tr. 20–22. At step one, the Appeals Council determined Jacobson was the unmarried child

---

[3] Jacobson submitted additional statements from Dr. Fink and nurse practitioner Russell. See Tr. 19. As the statements supposedly related to Jacobson's present condition, and not his condition before the ALJ's decision on December 14, 2016, the Appeals Council concluded the evidence did not affect its decision. Id. These statements from Dr. Fink and nurse practitioner Russell do not appear in the Administrative Record.

11

of a wage earner at the time of his CIB application, and that he had not engaged in substantial gainful activity since September 30, 2013. Tr. 22. At step two, the Appeals Council found Jacobson had the severe impairments of "borderline intellectual functioning, disruptive mood disorder, attention deficit hyperactivity disorder, epilepsy and attention deficit disorder," but determined that they did not "meet or medically equal" a recognized impairment. Tr. 20.

At step three, the Appeals Council evaluated Jacobson's mental impairments under 20 C.F.R. §§ 404.1520a and 416.920a, pursuant to the change in law, rather than under "Paragraph B," as the ALJ had done. Id.; see Tr. 31. The Appeals Council determined Jacobson had "moderate limitations in the ability to understand, remember, or apply information; moderate limitations in the ability to interact with others; moderate limitations in the ability to concentrate, persist, or maintain pace; and mild limitations in the ability to adapt or manage oneself." Tr. 20.

The Appeals Council affirmed without modification the ALJ's RFC, noting the ALJ's decision "adequately addresse[d]" the medical evidence that was dated before January 1, 2014. Tr. 20–21. The Appeals Council also affirmed the ALJ's finding as to step four (no past relevant work) and step five (Jacobson could perform the jobs of laborer and packer). Tr. 21.

Following the Appeals Council's decision, Plaintiff initiated this action by filing his complaint seeking reversal and remand. ECF No. 1.

**APPLICABLE LAW**

**I.   Standard of Review**

A party may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if, from the pleadings, the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. & Its Local 537, 47 F.3d 14, 16

(2d Cir. 1995) (per curiam). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

An ALJ's determination may be set aside only if it is based upon legal error or it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cr. 1998)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. See Brault v. Soc. Sec'y Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.") (emphasis in original) (citations and internal quotation marks omitted). Though this standard is deferential to an ALJ's findings, an ALJ's disability determination must be reversed or remanded if it is not supported by "substantial evidence" or if it contains legal error. See Rosa, 168 F.3d at 77.

**II.     Definition of Disability**

A claimant is disabled under the Social Security Act if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. §§ 423(d)(3), 1382c(a)(3)(D). A claimant will be determined to be disabled only if the "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." Id. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process to make disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order: if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. See 20 C.F.R. §§ 404.1520, 416.920. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner

14

>to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)).

Where a plaintiff alleges a mental impairment, steps two and three require the ALJ to apply a "special technique," outlined in 20 C.F.R. § 416.920(a), to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three. See Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). If the ALJ concludes that the claimant has a "medically determinable mental impairment," the ALJ must then "specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s)," and "rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Section 416.920a]," which provides four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. §§ 416.920a(b), (c)(3); see also Kohler, 546 F.3d at 265–66.

A claimant bears the burden of proof as to steps one, two, three, and four; the Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) (citation omitted).

## DISCUSSION

The ALJ found that Jacobson could work at "all exertional levels" but with certain non-exertional limitations: "the claimant is able to understand, remember and carry out simple, routine tasks in a low stress job defined as having decision-making and changes in work setting related to no more than simple routine tasks and with no more than occasional interaction with the general public, coworkers and supervisors." Tr. 33. The Appeals Council adopted the ALJ's

RFC. Tr. 20–21. In reaching this conclusion, the ALJ considered Jacobson's medical history, his and his mother's testimony, and the opinion evidence from P. Kennedy-Walsh, Ph.D., Dr. Orrin Devinsky, Dr. McLean Long, Dr. Melissa Antiaris, and Dr. Candida Fink. Tr. 33–38. The ALJ assigned little weight to Dr. Fink and Dr. Devinsky, Jacobson's treating physicians, while assigning significant weight to P. Kennedy-Walsh, Dr. McLean Long, and Dr. Antiaris, the agency consultants. Id.

Jacobson argues that the SSA erroneously denied his claims for DIB, SSI, and CIB by failing to accord the appropriate weight to his treating providers. See ECF No. 14 at 16–25. Accordingly, he argues the ALJ's RFC—which the Appeals Council adopted without modification—is inaccurate, and therefore remand is required. Id.

Under the "Treating Physician Rule" of the SSA, "a treating source's medical opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s)" is given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2).[4] Accordingly, the rule provides that the opinions of a claimant's "treating physician[s]" are entitled to a degree of deference, and the ALJ is "required either to give . . . controlling weight [to such opinions] or to provide good reasons for discounting them." Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (citing 20 C.F.R.

---

[4] On March 27, 2017, the Social Security Administration revised its regulations to remove the treating physician rule. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017). Under the new rules, ALJs must "weigh all medical evaluations, regardless of their sources, on the basis of how well supported they are and their consistency with the remainder of the record." Distefano v. Berryhill, 363 F. Supp. 3d 453, 463 n.4 (S.D.N.Y. 2019) (citation omitted). But because Plaintiff filed his claim before the new rule's effective date of March 27, 2017, the ALJ was obligated to comply with the Treating Physician Rule. See 20 C.F.R. § 404.1527 (providing that the Social Security Administrating will give "controlling weight" to opinions of treating physicians that are well-supported for claims filed before March 27, 2017).

§ 404.1527(d)(2)); see also Urena v. Comm'r of Soc. Sec., 379 F. Supp. 3d 271, 280 (S.D.N.Y. 2019) (citation omitted) (when a treating source's opinion is not given controlling weight, "the ALJ must provide 'good reasons' for the weight given to that opinion or face remand"). Conversely, a treating physician's opinion is "not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts." Halloran, 362 F.3d at 32 (citing Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. § 404.1527(d)(2)).

There are six factors an ALJ should consider when determining how much weight to give the treating source's opinion: (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. 20 C.F.R. § 404.1527(c)(2)–(6); see Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008).

Jacobson asserts that ALJ failed to comply with 20 C.F.R. § 404.1527, and that in assessing his RFC, the ALJ considered and assigned little weight to Jacobson's two treating physicians, Dr. Fink and Dr. Devinsky, in favor of assigning significant weight to the two consultative examiners. ECF No. 14 at 16–25; see Tr. 37–38.

Because the Appeals Council adopted the ALJ's reasoning as to Jacobson's RFC, Tr. 20, the Court looks to the ALJ's weighing of the medical evidence. The ALJ erred in assigning "little weight" to Dr. Fink's opinion, despite her being a treating source. Tr. 38. The ALJ failed to note, nor even consider, the length and frequency of Dr. Fink's treatment relationship with Jacobson, as required by SSA rules and regulations. 20 C.F.R. § 404.1527(c)(2). Dr. Fink had

been treating Jacobson quarterly since 2009—for approximately seven years by the time the ALJ made his determination. See Tr. 369. Nor did the ALJ consider the nature and extent of Dr. Fink's treatment relationship with Jacobson, despite her extensive notes in the record. Tr. 37–38; see Tr. 369–75, 395–426. The ALJ similarly did not discuss Dr. Fink's area of expertise—yet another required factor. See 20 C.F.R. § 404.1527(c)(5). These failures to comply with the regulatory guidelines alone compel remand. Snell v. Apfel, 177 F.3d 128, 133–34 (2d Cir. 1999) (failure to provide "good reasons" is grounds for remand).

The ALJ principally afforded Dr. Fink's opinion little weight because he concluded it was not supported by the evidence and was inconsistent with the record as a whole. Tr. 38; see 20 C.F.R. §§ 404.1527(c)(3), (4). In particular, the ALJ concluded that Dr. Fink's report that Jacobson could not function as an independent adult and required high levels of support were incongruous with Jacobson's IQ tests, his testimony, and the opinions of the consultative examiners. Tr. 38. The ALJ acknowledged that Jacobson had evidenced "grandiose behavior," but dismissed that concern because Jacobson's thought process was recorded as "goal directed, organized, linear and logical," without considering Dr. Fink's findings on that matter. Id. While certainly non-examining sources can, if supported by evidence in the record, "override treating sources' opinions," Dr. Fink's opinions are also supported by substantial evidence and not entirely inconsistent with the opinions of the medical consultants. See Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993).

The ALJ also afforded Dr. Fink's opinion little weight because he found it "inconsistent with the I.Q. testing which is accompanied by the well supported opinion of Dr. Antiaris's." Tr. 38. It is not fully clear where the inconsistencies lie. Dr. Fink noted that, based on a 2009 IQ test, Jacobson had a full scale IQ of 75, a verbal comprehension score of 76, perceptual reasoning

score of 90, working memory score of 74, and a processing speed score of 76. Tr. 370. She found these test scores to be borderline, though she concluded Jacobson's "adaptive function" to be "far below average, in the low functioning range." Id. When Dr. Antiaris administered the IQ test, she obtained similar results: verbal comprehension index of 74; perceptual reasoning index of 86; working memory index of 86; processing speed index of 74; and a full scale IQ of 75. Tr. 440. She, too, concluded that this placed Jacobson in the "borderline range" for his full scale IQ, verbal comprehension, and processing speeds. Tr. 440–41. She also noted that regarding "adaptive functioning," Jacobson "has some difficulty with social skills." Tr. 441. In addition, Dr. Fink's observation that Jacobson had "very impaired insight into his skills versus his goals," Tr. 374, and his statement that he could "act just fine in front of a judge" in order achieve a certain result, Tr. 416, warranted additional examination into the evidence before the ALJ, rather than merely affording Dr. Fink less weight. This is not to say that the opinions of Dr. Fink and Dr. Antiaris, among the other medical consultants, can be completely reconciled. But they do not provide "good reason" for according little weight to one of Jacobson's treating physicians.

      The ALJ also attributed little weight to Jacobson's other treating physician, Dr. Devinsky. Tr. 36–37. Once again, the ALJ failed to comply with the regulatory mandate to consider the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, and the physician's specialty. 20 C.R.F. § 404.157(c). The ALJ failed to refer or consider that Dr. Devinsky was Jacobson's neurologist for over 18 years. Tr. 394. The ALJ did, however, appropriately conclude that the question of disability was reserved to the Commissioner. Tr. 36–37; see 20 C.F.R. § 404.1527(d). Although the ALJ provided slightly more reasons for the lesser weight he attributed to Dr. Devinsky's opinion, he incorrectly dismissed Dr. Devinsky's opinion as unsupported. Tr. 36–37. Dr. Devinsky's

opinions as to Jacobson's impairments in his "ability to understand how another person is thinking and reaction" to his actions, Tr. 394, is supported by Jacobson's own testimony and other record evidence indicating his problems with his manager at work, Tr. 37, 466, his family, Tr. 400, 410, and his work coach, Tr. 408.

Therefore, the Appeals Council's failure to apply the treating physician rule appropriately constitutes legal error and requires remand. Snell, 177 F.3d at 133–34. Because this legal error infected the ALJ's RFC determination, and therefore the Appeals Council's determination, on remand, the Appeals Council should reevaluate Plaintiff's capacity to work. See Bradley v. Colvin, 110 F. Supp. 3d 429, 442 (E.D.N.Y. 2015) (finding that RFC is not supported by substantive evidence when ALJ made that decision "by failing to follow the treating physician rule").

## CONCLUSION

The ALJ's failure to apply the treating physician rule properly constitutes legal error, thereby warranting remand. Plaintiff's motion for judgment on the pleadings is therefore GRANTED, and the Commissioner's cross-motion for judgment on the pleadings is DENIED. The matter is remanded under sentence four of 42 U.S.C. § 405(g) to the Commissioner for further administrative proceedings consistent with this Order. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 13 and 18, and close this case.

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

DATED: November 30, 2020
New York, New York